# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF NEBRASKA

| | | |
|---|---|---|
| Ameritas Life Insurance Corp., | ) | |
| | ) | Case No.: |
| Plaintiff, | ) | |
| | ) | |
| | ) | |
| | ) | **COMPLAINT** |
| Wilmington Trust, National Association, as | ) | |
| Securities Intermediary, | ) | |
| | ) | |
| Defendant. | ) | |

Plaintiff, Ameritas Life Insurance Corp. ("Ameritas"), files and asserts its Complaint against Defendant, Wilmington Trust, National Association, solely in its capacity as Securities Intermediary ("Wilmington Trust"), and in support thereof, alleges as follows:

## INTRODUCTION

1. This action involves a stranger-originated life insurance ("STOLI") policy that was manufactured on the life of Jacqueline Leone (the "Insured"), who, upon information and belief, was induced to lend her life to investors who procured or caused be procured a $6 million wagering policy on her life (the "Policy") in violation of Georgia's insurable interest laws and public policy.

## PARTIES

2. Ameritas is a life insurance company incorporated under the laws of the State of Nebraska with its principal place of business in the State of Nebraska. Ameritas is therefore a citizen of the State of Nebraska for purposes of diversity jurisdiction.

3. Upon information and belief, Defendant, Wilmington Trust, is a Delaware corporation with its principal place of business at 1100 N. Market St., Rodney Sq., Wilmington, Delaware 19801. Wilmington Trust is therefore a citizen of the State of Delaware for purposes of diversity jurisdiction.

## JURISDICTION AND VENUE

4.  This Court has subject-matter jurisdiction under 28 U.S.C. § 1332 because the amount in controversy exceeds $75,000, and because there is complete diversity of citizenship between Plaintiff, a citizen of Nebraska, and Defendant, a citizen of Delaware.

5.  This Court has personal jurisdiction over Defendant, Wilmington Trust, because Defendant purposefully availed itself of the rights and privileges of doing business in Nebraska and because Ameritas' Complaint arises out of Defendant's and its predecessors' transaction of business in Nebraska and its contracts to supply services in Nebraska, including its acquisition and maintenance of the Policy, which was issued by a Nebraska life insurer (Ameritas). *See* Neb. Rev. Stat. § 25-536 (Reissue 2016).

6.  Venue is proper in this judicial district under 28 U.S.C. § 1391(b) because a substantial part of the events giving rise to Plaintiff's claims occurred in the District of Nebraska.

## FACTS COMMON TO ALL CLAIMS

### A. The Policy Was Incepted As a Wager By Investors Who Lacked An Insurable Interest In Ms. Leone's Life

7.  For hundreds of years, speculators have sought to use life insurance to wager on the lives of strangers. *See Crum v. Jackson Nat. Life Ins. Co.*, 880 S.E.2d 205, 207 (Ga. 2022) (explaining that, "[i]n the eighteenth century, it became popular in England to buy insurance on the lives of strangers . . . as a form of gambling," and that "[t]hese policies were considered gambling bets, not insurance against any risk of loss, because those who bought this 'insurance' had no interest in the underlying 'asset,' i.e., the life at stake."); *see also PHL Var. Ins. Co. v. Price Dawe 2006 Ins. Trust*, 28 A.3d 1059, 1069 (Del. 2011) ("*Price Dawe*") (human life wagering has existed "[s]ince the initial creation of life insurance"); *Sun Life v. Wells Fargo*, 238 N.J. 157, 164 (2019) (human life wagering has existed since at least 1419).

8. Under the laws of most jurisdictions, including Georgia, illegal human life wagering transactions are void *ab initio* and of no effect. *See Crum v. Jackson Nat. Life Ins. Co.*, 880 S.E.2d 025 (Ga. 2022).

9. Although speculators have been around for hundreds of years, never has the human life wagering problem been more wide-spread or involved such vast amounts of money than in recent years. In the early 2000s, institutional investors began pooling large blocks of high-value life insurance policies into special purpose vehicles, such as tax-exempt entities or trusts, the interests of which were securitized and sold to other investors. *See*, *e.g.*, Susan Lord Martin, *Betting on the Lives of Strangers: Life Settlements, STOLI, and Securitization*, 13 U. Pa. J. Bus. L. 173, 192 (2010).

10. Making matters worse, in the early 2000s, there was not a sufficient supply of existing life insurance policies to satisfy investor demand. In particular, investors were interested in high-face amount policies insuring the lives of senior citizens, but there were only a limited number of seniors who had unwanted policies of sufficiently high value. As a result, promoters sought to solve the supply side shortage by generating new, high value policies. These resulting life insurance policies came to be known as STOLI policies.

11. The specific mechanisms by which each funder's STOLI program operated could and often did vary in one respect or another. But each shared basic similarities including that the policies at issue were procured and/or ultimately paid for by third parties without an insurable interest in the insured.

12. In Georgia and other places, not only do these STOLI policies violate insurable interest laws, but they take advantage of senior citizens and otherwise distort the proper use of life insurance—which is to provide actual protection to an insured's family, or others with an insurable interest in the insured, in the event an untimely death—into a cash machine whereby a stranger to the insured is actually more interested in seeing the insured dead than alive.

13. In the mid-2000s, Jacqueline Leone was in her mid-seventies living in Miami, Florida.

14. Upon information and belief, in or around early 2007, STOLI investors as described above used Ms. Leone to procure millions of dollars of life insurance—not for Ms. Leone or her family or for a legitimate insurance purpose—but rather for the STOLI investors.

15. Upon information and belief, the investors did not have an insurable interest in Ms. Leone's life and would not have been able to acquire the Policy had they not used Ms. Leone to generate it in the first instance.

16. Specifically, as early as January 2007, Union Central Life Insurance Company ("Union Central") began receiving inquiries about issuing a life insurance policy insuring the life of a Florida resident, Jacqueline Leone, for $6,000,000.

17. Union Central was provided with an application for a life insurance policy (the "Application") insuring the life of Jacqueline Leone that listed the Jacqueline Leone Irrevocable Life Insurance Trust, a Georgia Trust (the "Leone Trust"), as the initial owner and beneficiary of the policy, and listed Kenneth A. Shapiro as the trustee of the Leone Trust.

18. The Application also represented to Union Central that the Insured was retired, had a gross income of $200,000, and had a net worth of $6.5 million.

19. The Application was signed on January 4, 2007 in Atlanta, Georgia by the Insured.

20. The Application was also signed on January 4, 2007 by Kenneth A. Shapiro as trustee of the Leone Trust, as proposed initial owner and beneficiary of the purported policy.

21. The Application contained declarations that the statements and answers in the Application were complete and true to the best of the signatories' knowledge and belief.

22. Thus, in completing the Application, the signatories knew that they were required to provide truthful, accurate, and honest responses to the questions presented. Furthermore, they knew that Union Central would rely upon the statements recorded on the Application in determining whether to issue a policy with the face amount requested, or whether to issue a policy at all.

23. Upon information and belief, and unbeknownst to Union Central at the time, the Policy was procured or caused to be procured by third parties who lacked an insurable interest in the Insured and were effectuating a strawman transaction as a cover for a wager in violation of Georgia law.

24. On or about February 1, 2007, in reliance on the Application and other documents and information provided to Union Central, Union Central issued policy number U000036824, insuring the life of the Insured, with a face amount of $6 million, which, upon information and belief, was delivered to Kenneth A. Shapiro, the trustee of the Leone Trust, in Georgia.

25. Upon information and belief, Mr. Shapiro, as trustee of the Leone Trust, acknowledged physical delivery of the Policy in Atlanta, Georgia, by executing a policy delivery receipt.

26. On or about February 28, 2007, an initial premium payment of $349,110 was made for the Policy.

27. Upon information and belief, and unbeknownst to Union Central at the time, at no point was the Insured or her husband at risk that their own funds would be ultimately used to pay premiums on the Policy.

28. On July 1, 2014, Union Central merged into Ameritas, and as a result, with respect to the Policy, Ameritas is the successor in interest to Union Central.

29. After several policy ownership and beneficiary changes, on or about May 23, 2019, Ameritas received and honored a request to change the Policy owner and beneficiary from Wells Fargo Bank N.A., as Securities Intermediary to Wilmington Trust N.A., as Securities Intermediary for an undisclosed third party.

**B.   The Policy Was Procured as Part of an Illegal Wagering Scam to Gamble on the Life of Ms. Leone**

30. Upon information and belief, the Insured died on November 23, 2022.

31. Following receipt of notification of death from third-party administrators for Wilmington Trust, as Securities Intermediary, Ameritas commenced a review of the purported Policy and has determined, upon information and belief, that it was procured as an illegal wager on the life of the Insured as part of a STOLI scheme in violation of Georgia law.

32. Ameritas has further determined, upon information and belief, that the Policy lacked an insurable interest prior to and at its inception and that any appearance of insurable interest was superficial only and was in reality a complete and total sham designed to conceal the true wagering nature of the Policy.

33. Moreover, upon information and belief, the source of the funds for the initial premium payment on the Policy was not the Insured or any person or valid entity possessing an insurable interest in her life. Instead, the source of the premium was a third-party investor(s) who lacked an insurable interest in the Insured's life and was/were procuring or causing to be procured the Policy and were thereby participating in a wager on the Insured's life.

34. Upon information and belief, the Policy premiums were paid with funds ultimately provided by the third-party investors.

# FIRST CAUSE OF ACTION

## DECLARATORY JUDGMENT – ILLEGAL HUMAN LIFE WAGERING CONTRACT AND LACK OF INSURABLE INTEREST

35. Ameritas hereby incorporates by reference each and every allegation contained in the preceding paragraphs as if set forth herein at length.

36. The Policy was applied for and signed for in Georgia by a Georgia trust, as initial owner and beneficiary of the Policy. Upon information and belief, the Policy was then actually delivered to the trustee of the Leone Trust, Kenneth Shapiro, in Atlanta, Georgia. The Policy is governed by Georgia law. OCGA § 33-24-3 (c), (g), (h), (i), (k).

37. The Georgia Supreme Court in *Crum* addressed the issues associated with life insurance policies used to wager on the death of insureds and has held that, under Georgia law, such policies are mere wagering contracts and are void *ab initio*.

38. As set forth herein, the Policy was, from the outset, procured or caused to be procured by and for the benefit of STOLI investors, their agents, and/or other third parties who lacked an insurable interest in the life of the Insured and were effectuating a strawman transaction whereby the Policy was used as a cover for a wager on the life of the Insured.

39. Regardless of whether Ms. Leone knew the details of this scheme or her identity was merely used as an instrumentality to procure the Policy, stranger investors were wagering on Ms. Leone's life and hoping to trigger a secondary market cash-in on the Policy's death benefit.

40. Accordingly, Ameritas seeks, and is entitled to, a declaratory judgment that the Policy was an illegal wagering contract that violated Georgia's statutes, common law, and public policy, thus rendering the Policy void *ab initio*.

WHEREFORE, Ameritas respectfully requests the entry of an Order by this Court as follows:

A. Declaring that the Policy is void *ab initio* due to it having been procured as a wagering contract on the life of Ms. Leone;

B. Declaring that the Policy is void *ab initio* due to it having been procured without a valid insurable interest at inception;

C. Declaring that because the Policy is void *ab initio* it never existed;

D. Awarding Ameritas attorneys' fees and costs associated with bringing this lawsuit, as determined by the Court; and

E. Awarding Ameritas any further relief this Court deems appropriate.

DATED: March 21, 2023

BAYLOR EVNEN, LLP
*/S/ CHRISTOPHER M. SCHMIDT*
Christopher M. Schmidt, Esq. (#26096)
Randall L. Goyette, Esq. (#16251)
1248 O Street, Suite 600
Lincoln, NE 68508
(402) 475-1075
cschmidt@baylorevnen.com
rgoyette@baylorevnen.com

COZEN O'CONNOR
Michael M. Miller, Esq. (pro hac vice to be filed)
Philip J. Farinella, Esq. (pro hac vice to be filed)
Justin K. Risser, Esq. (pro hac vice to be filed)
One Liberty Place, Suite 2800
Philadelphia, PA 19103
(215) 665-2000
mjmiller@cozen.com
pfarinella@cozen.com
jrisser@cozen.com
*Attorneys for Plaintiff, Ameritas Life Insurance Corp.*